UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

ABDULGALIL KAID ALWAN,

                Plaintiff,

    -against-

THE CITY OF NEW YORK; NEW YORK CITY
POLICE DEPARTMENT; NICHOLAS NELSON; and
JESSICA HERNANDEZ,

                Defendants.
------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**14-CV-4556 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiff Abdulgalil Alwan's son was involved in a traffic accident and called his father to

the scene of the accident. While Plaintiff was waiting with his son, he was confronted by New

York City Police Department ("NYPD") officers Nicholas Nelson and Jessica Hernandez,

arrested, briefly detained, and cited for disorderly conduct and disobeying a lawful order. (Defs.

Statement of Material Facts ("Defs. 56.1") (Dkt. 43) ¶¶ 5-21.) Plaintiff subsequently filed this

suit, which alleges, among other things, that Nelson and Hernandez violated various of his rights

under the U.S. and New York State constitutions and New York tort law. (Compl. (Dkt. 1).)

Before the court is Defendants' motion for partial summary judgment as to Plaintiff's claims

against the NYPD, his claims under the New York State Constitution, his claims under 42 U.S.C.

§ 1983 against the City of New York, and his intentional-infliction-of-emotional-distress

("IIED") and negligence claims. (Defs. Mot. for Partial Summ. J. (Dkt. 41); Defs. Mem. in

Supp. of Mot. for Partial Summ. J. ("Defs. Mem.") (Dkt. 42).) For the reasons that follow,

Defendants' motion for partial summary judgment is GRANTED IN PART and DENIED IN

PART.

## I.    BACKGROUND

### A. Factual History

The following statement of facts is largely taken from the parties' Local Rule 56.1

statements and deposition testimony, with the evidence "constru[ed] . . . in the light most

favorable to the non-moving party." Wandering Dago, Inc. v. Destito, 879 F.3d 20, 30

(2d Cir. 2018) (internal quotation marks and citation omitted). (See Defs. 56.1; Pl. Resp. to

Defs. 56.1 ("Pl. 56.1 Resp.) (Dkt. 45 at ECF pp.1-3); Pl. Counterstatement of Material Facts ("Pl.

56.1 Counterstatement") (Dkt. 45 at ECF pp.3-15); Defs. Resp. to Pl. Counterstatement of

Material Facts ("Defs. 56.1 Reply") (Dkt. 49).)

On September 8, 2013, Plaintiff's teenaged son was riding in a car that was struck by

another vehicle. (Defs. 56.1 ¶ 5.) The son called Plaintiff, who came to the scene of the

accident. (Id. ¶¶ 6-7.)

Soon afterwards, Hernandez and Nelson arrived at the scene of the accident as well. (Id.

¶¶ 9-10.) According to Plaintiff, Nelson immediately began shouting at everyone present to

move back. (Pl. 56.1 Counterstatement ¶ 3; Pl. Dep. Tr. (Dkt. 47-2) 30:7-8, 35:2-11.) Nelson

asked Plaintiff if Plaintiff had been in one of the cars involved in the accident; when Plaintiff

said that he was not, Nelson allegedly pushed him back. (Pl. Dep. Tr. 38:25-39:4.) Plaintiff

allegedly then told Nelson that Plaintiff's son had been in the accident, that the son was scared,

and that Plaintiff needed to remain with him. (Id. 35:12-36:11, 36:18-37:13.) According to

Plaintiff, Nelson then asked him for identification and, while Plaintiff was trying to get his

identification, pushed him "so hard," twisted his arm, threw him up against a wall, and, with

Hernandez's help, handcuffed him. (Defs. 56.1 ¶ 15; Pl. 56.1 Counterstatement ¶¶ 4-5; Pl. Dep.

Tr. 36:13-17, 37:14-38:13, 38:25-39:10.) Nelson then allegedly threw Plaintiff to the ground,

dragged him by the handcuffs to a police car, slammed him against the police car, put him in the

2

back seat of the car, and punched him repeatedly in the torso. (Defs. 56.1 ¶ 15; Pl. 56.1 Counterstatement ¶¶ 6-7; Pl. Dep. Tr. 39:24-40:1, 43:18-22, 45:19-46:4, 47:16-48:5, 50:3-52:18.) While allegedly punching Plaintiff, Nelson asked where Plaintiff was from; when Plaintiff responded that he was from Yemen, Nelson allegedly said that "in Yemen they spit in your face." (Pl. 56.1 Counterstatement ¶ 9; Pl. Dep. Tr. 52:19-24.) Meanwhile, Hernandez, who was sitting in the front of the cruiser, allegedly asked Plaintiff "was this worth it[?]" (Pl. 56.1 Counterstatement ¶ 10; Pl. Dep. Tr. 53:22-54:1.)[1]

When two other officers arrived at the scene, Nelson allegedly uncuffed Plaintiff and told him that he was lucky that the other officers had arrived to rescue him. (Pl. 56.1 Counterstatement ¶ 13; Pl. Dep. Tr. 60:13-15.) Plaintiff was cited for disorderly conduct and released, and he promptly headed to the 66th Precinct to file a complaint. (Pl. 56.1 Resp. ¶ 20; Pl. 56.1 Counterstatement ¶ 17; Pl. Dep. Tr. 63:13-16, 64:16-18.) The disorderly-conduct charged was subsequently dismissed (Defs. 56.1 ¶ 21; Pl. Dep. Tr. 55:16-56:25), and two police officers (whose names he could not remember) allegedly visited his home several months later to apologize for his mistreatment and to say that Nelson needed additional training (Pl. 56.1 Counterstatement ¶ 18; Pl. Dep. Tr. 116:25-118:11).

---

[1] In their depositions, Hernandez and Nelson offered a different account of the incident. They testified that they arrived on the scene of the accident to find that Plaintiff was screaming at the driver of the car that hit the car in which his son was riding. (Nelson Dep. Tr. 39:11-40:22, 42:17-43:8; cf. Hernandez Dep. Tr. 83:17-23, 84:4-14, 85:23-86:13.) According to the officers, Plaintiff refused to stop screaming or to provide the officers with identification. (Nelson Dep. Tr. 45:3-47:5, 49:2-8, 51:2-53:12, 60:4-61:7; Hernandez Dep. Tr. 77:5-90:13.) Nelson and Hernandez both denied that Nelson used significant force to arrest Plaintiff; that Nelson slammed Plaintiff against a wall, dragged him along the ground, slammed him against a police car, punched him, or referred to Plaintiff's country of origin in a derogatory way during the incident; or that Hernandez taunted Plaintiff while he was detained in the back seat of the police car. (Nelson Dep. Tr. 61:11-74:24, 85:18-87:21; see also Hernandez Dep. Tr. 90:14-17, 93:24-94:5, 96:25-97:21, 99:4-100:22.) Nevertheless, "[i]t is a settled rule that 'credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006) (alteration adopted) (quoting Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir.1997)). Accordingly, the court must accept Plaintiff's plausible account of the incident as true for purposes of this motion.

3

## B. Procedural History

Plaintiff served a notice of claim against the City of New York (the "City") and the NYPD on November 15, 2013, and testified at a hearing held pursuant to Section 50-h of the New York General Municipal Law. (Compl. (Dkt. 1) ¶¶ 7-8.) He thereafter commenced this action, which asserts twelve claims against the City, NYPD, Hernandez, and Nelson under 42 U.S.C. § 1983 and New York State law. (Id. ¶¶ 41-88.) With respect to Plaintiff's claims under federal law, Plaintiff alleges (1) that Hernandez and Nelson violated his Fourteenth Amendment right to equal protection of the laws by subjecting him to mistreatment based on his country of origin (id. ¶¶ 41-44); (2) that they unreasonably searched and seized him, in violation of the Fourth and Fourteenth Amendments (id. ¶¶ 45-48); (3) that they used excessive force against him, in violation of the Fourth and Fourteenth Amendments (id. ¶¶ 49-52); and (4) that he was injured as a result of municipal customs and policies, such that the City is liable under Monell v. Department of Social Services, 436 U.S. 658 (1978), for the deprivation of his constitutional rights (Compl. ¶¶ 53-60). With respect to his claims under New York State law, Plaintiff alleges that Defendants violated his rights under the New York Constitution to the equal protection of law (id. ¶¶ 61-63) and not to be unlawfully searched and seized or subjected to excessive force (id. ¶¶ 64-66); that Defendants are liable in tort for unlawful infliction of emotional distress (id. ¶¶ 67-69), battery (id. ¶¶ 70-74), assault (id. ¶¶ 75-78), and negligence, both in failing to protect him (id. ¶¶ 79-82) and for hiring and retaining Nelson and Hernandez (id. ¶¶ 83-85); and that the Municipal Defendants are liable under a theory of respondeat superior for all of Hernandez's and Nelson's allegedly unlawful acts (id. ¶¶ 86-88).

As noted above, Defendants have moved for partial summary judgment. Defendants do not seek summary judgment with respect to Plaintiff's § 1983 equal-protection, search-and-seizure, or excessive-force claims against Hernandez and Nelson, his state-law assault or battery

claims, or his claim that the City is vicariously liable for Hernandez's and Nelson's intentional torts. (Cf. Defs. Mem. at 5-6.) Instead, Defendants only argue in their motion that they are entitled to summary judgment as to Plaintiff's Monell, state constitutional, IIED, and negligence claims. (Id.)

After Defendants filed their motion for partial summary judgment, Plaintiff withdrew his New York State constitutional claims against Nelson and Hernandez (Pl. Mem. in Opp'n to Mot. for Partial Summ. J. ("Pl. Mem.") (Dkt. 46) at 14), his IIED claim (id. at 15), and his negligent-failure-to-protect claim (id.). Plaintiff refused, however, to withdraw his negligent-training-and-supervision claim "absent a clear concession that Officers Nelson and Hernandez were acting within the scope of their employment" at the time of his arrest. (Id. at 16-17.) Defendants conceded this point in their reply brief (Defs. Reply in Supp. of Mot. to Dismiss ("Defs. Reply") (Dkt. 48) at 10), so the parties appear to agree that Plaintiff's state-law negligent-training-and-supervision claim is untenable. See Passucci v. Home Depot, Inc., 889 N.Y.S.2d 353, 355 (App. Div. 2009) (stating that, under New York law, a negligent-training-and-supervision claim "does not lie where . . . the employee is acting within the scope of his or her employment" (quoting Drisdom v. Niagara Falls Mem. Med. Ctr., 861 N.Y.S.2d 919, 921 (App. Div. 2008))).

Thus, only two claims remain in dispute, for purposes of this motion: (1) Plaintiff's Monell claim against the City (Compl. ¶¶ 53-60); and (2) his claims under the New York State Constitution, to the extent he asserts them against the City under a respondeat superior theory (id. ¶¶ 61-66, 86-88). The court discusses these claims in turn.

## II.    LEGAL STANDARD

The court may enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the court draws all reasonable inferences

and resolves all ambiguities in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254-55 (1986). The court may enter summary judgment if the evidence, so construed, would not allow a reasonable jury to find in non-movant's favor. Id. at 249-50.

## III.    DISCUSSION

### A.  Monell / Failure to Train, Supervise, and Discipline

Although Plaintiff initially asserted a sweeping Monell claim (see Compl. ¶¶ 54, 56-57), he has since focused this claim on allegations that the City failed to train, supervise, or discipline its police officers (particularly Nelson) regarding their use of force, and that this failure amounted to deliberate indifference to his Fourth Amendment rights. (Pl. Opp'n at 7-12.) Defendants advance several reasons why, in their view, Plaintiff has not shown that he was injured pursuant to a municipal policy or custom, as is necessary to establish Monell liability. (Defs. Mem. at 5.) First, they argue, to the extent Plaintiff's Monell claim relies on a failure-to-train theory, he has not identified specific deficiencies with respect to the City's police-officer-training program or shown that such deficiency is "closely related to the ultimate injury" Plaintiff suffered. (Id. (quoting Dekuyper v. City of New York, No. 14-CV-8249 (DLC), 2016 WL 7335662 (S.D.N.Y. Dec. 16, 2016)).) Second, they contend, to the extent this claim relies on a theory that the City acted with deliberate indifference in failing to supervise or discipline its officers (particularly Nelson), he has not shown that there was an obvious need for better supervision or discipline or that any deficiencies in supervision or discipline actually resulted in the deprivation of Plaintiff's constitutional rights. (Id.; Defs. Reply at 3-4.) The court agrees with Defendants that Plaintiff has not adduced evidence from which a rational factfinder could conclude that the City acted with deliberate indifference in failing to train, supervise, or discipline its police officers (and especially Nelson) regarding the use of force.

6

Municipalities cannot be vicariously liable under § 1983 for their employees' acts.

Monell, 436 U.S. at 694-95. Instead, municipalities are only liable under § 1983 for

constitutional deprivations resulting from a governmental policy or custom. Id. at 694. A

plaintiff may demonstrate that such a policy or custom exists by introducing evidence of one of

the following:

> (1) a formal policy officially endorsed by the municipality;
> (2) actions taken by government officials responsible for
> establishing the municipal policies that caused the particular
> deprivation in question; (3) a practice so consistent and widespread
> that, although not expressly authorized, constitutes a custom or
> usage of which a supervising policy-maker must have been aware;
> or (4) a failure by policymakers to provide adequate training or
> supervision to subordinates to such an extent that it amounts to
> deliberate indifference to the rights of those who come into contact
> with the municipal employees.

Jones v. Westchester County, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016) (quoting Brandon v.

City of New York, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)). To prevail on a Monell

claim, a plaintiff must show that "there is a direct causal link between [the] municipal policy or

custom and the alleged constitutional deprivation" he suffered. City of Canton v. Harris, 489

U.S. 378, 385 (1989).

When a Monell claim relies on the theory that the municipality failed to "train certain

employees about their legal duty to avoid violating [individuals'] rights," the plaintiff must show

that the "municipality's failure to train its employees in a relevant respect . . . amount[ed] to

'deliberate indifference to the rights of persons with whom the [untrained employees] came into

contact.'" Connick v. Thompson, 563 U.S. 51, 61 (2011) (quoting Canton, 489 U.S. at 388).

Likewise, to prevail on a Monell claim based on the theory that the municipality failed to

adequately supervise or discipline its employees (thereby implicitly encouraging or ratifying

their unlawful conduct), a plaintiff must show that such a failure of supervision or discipline was

tantamount to deliberate indifference. Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007)

(citing Amnesty Am v. Town of W. Hartford, 361 F.3d 113, 127 (2d Cir. 2004) (Sotomayor, J.)

(failure to supervise), and Berry v. City of Detroit, 25 F.3d 1342, 1354 (6th Cir. 1994) (failure to

discipline)); see also Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995) (failure to

supervise); Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983) (failure to discipline). In this

context, "[d]eliberate indifference is a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence of his action." Connick, 563 U.S.

at 61 (quoting Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 410 (1997)).

1. Failure to Train

The court first considers whether Plaintiff's Monell claim might be sustainable under the

theory that the City failed to train its police officers in general, or Nelson in particular, in the use

of force.

To establish that a municipality acted with deliberate indifference for purposes of a

failure-to-train claim, a plaintiff must meet three requirements.

> First, the plaintiff must show that a policymaker knows "to a moral
> certainty" that her employees will confront a given situation. Thus,
> a policymaker does not exhibit deliberate indifference by failing to
> train employees for rare or unforeseen events.

> Second, the plaintiff must show that the situation either presents the
> employee with a difficult choice of the sort that training or
> supervision will make less difficult or that there is a history of
> employees mishandling the situation. . . .

> Finally, the plaintiff must show that the wrong choice by the city
> employee will frequently cause the deprivation of a citizen's
> constitutional rights. Thus, municipal policymakers may
> appropriately concentrate training and supervision resources on
> those situations where employee misconduct is likely to deprive
> citizens of constitutional rights.

Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992) (internal quotation marks and citations omitted). To make out such a claim, a plaintiff generally must also show that "city policymakers [were] on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights" but nevertheless chose to retain the program. Connick, 563 U.S. at 61-62. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for failure to train.'" Id. at 62 (quoting Bryan County, 520 U.S. at 409). Additionally, to prevail on a failure-to-train claim, a plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." Wray v. City of New York, 490 F.3d 189, 196 (2d Cir. 2007) (quoting Amnesty Am., 361 F.3d at 129).

Plaintiff has not produced any policy manuals or training materials in support of the theory that the City acted with deliberate indifference in failing to train its officers in the use of force. (See Defs. Mem. at 5.) Instead, he relies on a 2015 report prepared by the Office of the Inspector General for the NYPD ("OIG-NYPD") regarding the NYPD's use of force (the "IG Report"), which discusses the City's use-of-force training (Off. of the Inspector Gen., N.Y.C. Dep't of Investigation, Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices (2015) (Dkt. 47-19) at 39-44), and on the deposition testimony of Nelson and Hernandez. In the IG Report, the OIG-NYPD reviewed how the NYPD trains academy cadets and active-duty officers in the use of force, ultimately concluding that the NYPD should both place greater emphasis in training on how to de-escalate tense situations and increase the police academy's use of "scenario and simulation trainings." (IG Report at 39-44.) In their depositions, both Hernandez and Nelson were questioned about the use-of-force training they

received as cadets and on the job. While Hernandez gave conflicting testimony about whether she could remember receiving any such training (compare Hernandez Dep. Tr. 12:11-15, with id. 107:13-17, and id. 107:22-108:4), Nelson testified that he had received such training both in the academy and on the job, although he could not remember the precise meaning of "Level II force" or recall the NYPD Patrol Guide's procedures regarding the use of force (Nelson Dep. Tr. 14:17-21, 126:20-127:3; 127:11-128:8, 129:2-5, 129:19-130:7, 130:16-131:4).

After reviewing this evidence, the court cannot discern any "specific deficiency in the city's training program" that was "closely related" to Plaintiff's alleged injuries. As an initial matter, the evidence before the court shows that the NYPD does, in fact, train its officers in the use of excessive force, and that Nelson in particular received such training. Simply alleging that Nelson used excessive force against Plaintiff does not show that Nelson received inadequate training about when and how to use force. See, e.g., Jenkins v. City of New York, 478 F.3d 76, 95 (2d Cir. 2007) ("A training program is not inadequate merely because a few of its graduates deviate from what they were taught."). For the same reason, the fact that Nelson could not remember details about his training—or that Hernandez apparently could not remember anything about her training—does not show that the training was itself inadequate. While Plaintiff insinuates that Nelson's on-the-job training was inadequate because it "came in the form of watching a video tape" (Pl. Mem. at 7), Plaintiff offers no evidence that videotapes are a deficient means of training or, even assuming solely for the sake of argument that they are, that the choice to train Nelson using videotapes, rather than some other means of training, was responsible for Plaintiff's alleged constitutional injuries.

The best evidence in support of Plaintiff's position is the IG Report, which expressly recommends that the NYPD enhance its training on the de-escalation of hostile encounters. (IG

Report at 43-44.) Courts in this district have repeatedly refused, however, to impose <u>Monell</u> liability on the basis of the IG Report. <u>See</u> <u>Hanson v. City of New York</u>, No. 15-CV-1447 (MKB), 2018 WL 1513632, at *21 (E.D.N.Y. Mar. 27, 2018) (collecting cases). Even assuming that the IG Report did establish that the NYPD's training on the de-escalation of hostile encounters was deficient, however, Plaintiff's failure-to-train claim is nevertheless unavailing, because, by his own account, Plaintiff was not interacting with Nelson or Hernandez in a way that would call for de-escalation. (<u>See</u> Pl. Dep. Tr. 35:2-56:3.) Thus, Plaintiff cannot show that this specific alleged deficiency in the NYPD's training program is causally connected to his claimed constitutional injuries.

Because Plaintiff has not produced "evidence of any deficient or absent training program related to . . . excessive force that could have caused the instant alleged violations," he cannot show that the City acted with deliberate indifference in failing to train its police officers, or Nelson in particular. <u>See</u> <u>Underwood v. City of New York</u>, No. 14-CV-7531 (RRM), 2018 WL 1545674, at *5 (E.D.N.Y. Mar. 28, 2018).

## 2. Failure to Supervise or Discipline

Nor can the City be liable under the theory that it acted with deliberate indifference by failing to "supervise, monitor and/or discipline" its police officers. (Pl. Mem. at 10.) This is because Plaintiff has not introduced evidence from which a rational factfinder could conclude that the City deliberately chose not to act in the face of an obvious risk that its police officers (or Nelson in particular) would use excessive force against members of the public.

As with his failure-to-train theory, Plaintiff's failure-to-supervise and failure-to-discipline theories require him to establish that the City acted with deliberate indifference. <u>See</u> <u>Reynolds</u>, 506 F.3d at 192; <u>Amnesty Am.</u>, 361 F.3d at 127-28. "To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional

violations was obvious." Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995) (citing

Canton, 489 U.S. at 390). "An obvious need may be demonstrated through proof of repeated

complaints of civil rights violations . . . ." Id.; see Fiacco v. City of Rensselaer, 783 F.2d 319,

328 (2d Cir. 1986). Plaintiff must also "show that the city was deliberately indifferent to these

obvious constitutional violations." Underwood, 2018 WL 1545674, at *4. "[D]eliberate

indifference may be inferred if the complaints are followed by no meaningful attempt on the part

of the municipality to investigate or to forestall further incidents." Vann, 72 F.3d at 1049. The

municipality's failure to take action must constitute "deliberate indifference, rather than mere

negligence or bureaucratic inaction." Amnesty Am., 361 F.3d at 128; see also Connick, 563 U.S.

at 61 ("Municipal liability under § 1983 attaches where—and only where—a deliberate choice to

follow a course of action is made from among various alternatives by the relevant officials."

(alterations adopted) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) (op. of

Brennan, J.)).[2]

### a. Police Officers in General

The court first considers whether Plaintiff has demonstrated the existence of a triable

issue as to whether the City turned a blind eye to an obvious risk that NYPD officers often use

excessive force against civilians, thereby evincing the City's deliberate indifference to those

civilians' Fourth Amendment rights. In support of this contention, Plaintiff points to the IG

Report, in which the OIG-NYPD analyzed 207 allegations of non-lethal force in 179 cases

between 2010 and 2014 and concluded that, among other things, the NYPD provided insufficient

---

[2] A plaintiff may also show deliberate indifference "through expert testimony that a practice condoned by the defendant municipality was 'contrary to the practice of most police departments' and was 'particularly dangerous' because it presented an unusually high risk that constitutional rights would be violated. Vann, 72 F.3d at 1049-50 (quoting Dodd v. City of Norwich, 827 F.2d 1, 4-6 (2d Cir.), modified on reh'g on other grounds, 827 F.2d 1, 7 (2d Cir.1987)). Plaintiff has presented no such evidence here.

guidance to officers about how to handle confrontations with members of the public and "frequently failed to impose discipline even when provided with evidence of excessive force." (IG Report at 1, 3-5.) As alluded to above, courts in this circuit have been hesitant to impose Monell liability on the basis of the IG Report alone. In particular, it is not clear that the IG Report rationally supports a finding that it was obvious that NYPD officers required additional supervision or discipline to prevent them from using excessive force against civilians. Compare Delorbe-Bell v. City of New York, No. 15-CV-2344 (LGS), 2016 WL 1451581, at *3-4 (S.D.N.Y. Apr. 12, 2016) (concluding that reliance on the IG Report alone was insufficient to state a Monell claim, as "the 207 substantiated allegations of excessive force . . . represent 'a notably modest number, given the size of the NYPD and a positive indication of the NYPD's restraint,'" and "the NYPD imposed discipline in the majority of cases where allegations of excessive force were substantiated" (quoting IG Report at 1)), and Boddie v. City of New York, No. 15-CV-4275 (GHW), 2016 WL 1466555, at *3 (S.D.N.Y. Apr. 13, 2016) (concluding that the IG Report did not support allegations of a "persistent" failure to discipline officers for the use of excessive force), with Marlin v. City of New York, No. 15-CV-2235 (CM), 2016 WL 4939371, at *19-21 (S.D.N.Y. Sept. 7, 2016) (concluding that, in conjunction with other evidence, the IG Report's finding that officers in more than 35 percent of substantiated excessive-force cases were not disciplined sufficed to allow the plaintiff's failure-to-discipline claim to withstand a motion to dismiss).

Even assuming that the IG Report could support such a conclusion in some other case, however, it cannot here, because it was issued well after Plaintiff's arrest. As noted above, the incident at issue in this suit took place in September 2013, but the IG Report was not published until March 2015. Absent some additional evidence—for example, about why the report was

commissioned and what the City knew as of September 2013—the IG Report alone does not create a triable issue as to whether the City was deliberately indifferent to the need for greater supervision or discipline to prevent the use of excessive force by NYPD officers in general. See Boddie, 2016 WL 1466555, at *3.

### b. Hernandez and Nelson

It is a somewhat closer call as to whether the City ignored an obvious need to better supervise or discipline Hernandez and Nelson, in particular, to attenuate the risk that either would use excessive force against members of the public. In support of this theory, Plaintiff points to evidence that both officers have been the subject of prior misconduct complaints. The court first discusses whether these complaints are sufficient to create a triable issue regarding the City's supervision or discipline of Hernandez, then turns to Nelson.

### i. Hernandez

The City cannot be liable based on its failure to supervise or discipline Hernandez. The record indicates that Hernandez was the subject of two prior Civilian Complaint Review Board ("CCRB") complaints: a 2008 complaint regarding "the use of physical force, discourteous words and offensive language regarding race" and a 2009 complaint "regarding offensive language relating to someone's race." (Pl. 56.1 Counterstatement ¶¶ 42-43.) Hernandez has also been the subject of three NYPD Internal Affairs Bureau ("IAB") investigations, none of which involved complaints of false arrest or the use of excessive force. (Id. ¶¶ 44-46.)[3] Thus, only one of these five complaints actually involved conduct similar to Plaintiff's Monell claim, which is

---

[3] Plaintiff also directed the court's attention to Bass v. City of New York, No. 14-CV-7201 (E.D.N.Y. filed Dec. 10, 2014s), in which the plaintiffs alleged that Hernandez and Nelson violated their rights under the U.S. Constitution and state tort law in connection with an incident that occurred six days after the incident at issue in this suit. See Am. Compl. (Dkt. 12), Bass. Because this incident occurred after Plaintiff's arrest, it has no logical bearing on the City's awareness, at the time of Plaintiff's arrest, of the risk that Hernandez and Nelson would engage in unconstitutional conduct. See Olschafskie v. Town of Enfield, No. 15-CV-67 (MPS), 2017 WL 4286374, at *15 (D. Conn. Sept. 27, 2017); Naples v. Stefanelli, 972 F. Supp. 2d 373, 388 (E.D.N.Y. 2013).

based on the City's alleged deliberate indifference to its officers' use of force. Without something more—for example, evidence that the 2008 incident involved such "extreme" use of force that the need for additional supervision or discipline should have been obvious, see Amnesty Am., 361 F.3d at 129—a single, five-year-old complaint about excessive force is insufficient to support a rational conclusion that it was "obvious" to the City that Hernandez required additional supervision or discipline. See Marshall v. Town of Middlefield, No. 10-CV-1009 (JCH), 2012 WL 601783, at *4-5 (D. Conn. Feb. 23, 2012) (single prior complaint insufficient to show that municipality was deliberately indifferent to constitutional rights).

### ii. Nelson

Nor can the City be liable for failure to supervise or discipline Nelson, though it is a closer call in light of Nelson's lengthy and troubling history of civilian complaints.

Nelson's record with the NYPD has been checkered, to put it gently. From early 2010 until the date of Plaintiff's arrest, Nelson received at least 11 CCRB complaints, the majority of which pertained to the use of physical force, verbal abuse, or discourtesy. (CCRB History (Dkt. 47-9 at ECF p.24) at ECF pp.25-26.) It appears that none of these complaints resulted in discipline, because the allegations against Nelson were unsubstantiated, Nelson was exonerated, or the complainant would not cooperate with the investigation. (Id.) During his deposition, Nelson testified that he had also been the subject of an additional CCRB complaint pertaining to an allegedly unlawful stop, threatened and actual use of physical force, and discourteous words. (Pl. 56.1 Counterstatement ¶ 61; Nelson Dep. Tr. 103:20-104:22.) As a result of having received three CCRB complaints within one year, Nelson was subject to "Level I" force monitoring beginning on June 19, 2012. (Pl. 56.1 Counterstatement ¶ 69.)[4] Nelson was also the subject of

---

[4] Due to the receipt of additional civilian complaints, Nelson was placed on Level II force monitoring on October 15, 2013. (Pl. 56.1 Counterstatement ¶ 72.) Because this upgrade in Nelson's force monitoring happened after the

five IAB investigations based on similar civilian complaints (which overlap in part with the CCRB complaints discussed above). (IAB Officer Resume (Dkt. 47-7); Defs. 56.1 Reply ¶ 63.)

Prior to the incident in question, Nelson was also the subject of at least three domestic-violence complaints, including (1) a 2009 incident in which Nelson pushed and choked his girlfriend (Pl. 56.1 Counterstatement ¶ 64); (2) an April 2010 incident in which Nelson threatened to mutilate a man he saw with his former girlfriend (id. ¶ 65); and (3) a September 2012 incident in which Plaintiff was accused of ransacking another girlfriend's house during a verbal dispute (id. ¶ 71). In April 2010, as a result of the first two incidents, Nelson was placed on "modified assignment," his firearm was taken away, and he was docked 20 vacation days. (Id. ¶¶ 66-67.) The third incident was, however, found by NYPD investigators to be largely unsubstantiated. (Feb. 19, 2014, Report (Dkt. 47-14 at ECF p.8) at ECF pp.8, 12.)

Finally, Plaintiff also notes that Nelson was named as a defendant in two civil-rights lawsuits based on incidents that took place before Plaintiff's arrest. (Pl. 56.1 Counterstatement ¶ 75.) In the first suit, the plaintiff alleged that, in May 2009, Nelson and other police officers falsely arrested him, used excessive force against him, and misrepresented that he had engaged in disorderly conduct. 1st Am. Compl. (Dkt. 1) ¶¶ 8-23, Mosely v. City of New York, No. 09-CV-2613 (E.D.N.Y. filed Nov. 13, 2009). In the second, the plaintiff alleged that, in response to a call about a domestic incident that took place in another apartment within the plaintiff's building, Nelson and other police officers broke into the plaintiff's apartment, assaulted him, and subjected him to false charges. 3d Am. Compl. (Dkt. 28) ¶¶ 16-24, Patrizio v. City of New York, No. 14-CV-7497 (E.D.N.Y. filed Dec. 24, 2014). Both of those cases have since been

---

incident at issue in this suit, it cannot be relevant to the question of what the City was aware of at the time of the incident.

settled. Stip. & Order of Settlement (Dkt. 17), Mosely (filed Jan. 5, 2010); Stip. & Order of

Dismissal (Dkt. 92), Patrizio (filed Oct. 13, 2016).

The court assumes without deciding that Nelson's history of civilian complaints and

disciplinary history are sufficient to create a triable issue as to whether the City was aware of a

risk that Nelson would use excessive force against arrestees. "Courts in the Second Circuit

routinely hold that multiple civilian complaints against an officer regarding conduct similar to

that exhibited toward a plaintiff is enough for a jury to find the requisite degree of indifference to

support failure to supervise liability under Monell." Coggins v. County of Nassau, 254 F. Supp.

3d 500, 520-21 (E.D.N.Y. 2017) (collecting cases); see also Vann, 72 F.3d at 1049; Fiacco, 783

F.2d at 238; White v. City of New York, No. 13-CV-7421 (KPF), 2015 WL 4601121, at *8

(S.D.N.Y. July 31, 2015) ("Courts have taken into account the existence of similar lawsuits when

deciding whether a plaintiff has adequately alleged a Monell claim."); Tieman v. City of

Newburgh, No. 13-CV-4178 (KMK), 2015 WL 1379652, at *21 (S.D.N.Y. Mar. 26, 2015).

Although the court need not resolve the question, it seems safe to say that Nelson's history of

complaints—which includes eight CCRB complaints, two additional IAB complaints, and two

lawsuits alleging the use of excessive force, as well as several domestic- or domestic-related

violence complaints—would suffice to create a triable issue as to whether it was obvious to the

City that there was a risk that Nelson would use excessive force against arrestees.[5]

---

[5] Some courts appear to have held that prior incidents of domestic violence by a police officer are insufficient to put a municipality on notice that the officer may be likely to use excessive force against civilians with whom he interacts in his professional capacity. See Burgos-Yantin v. Municipality of Juana Diaz, 669 F. Supp. 2d 191, 198-99 (D.P.R. 2009); Brown v. City of Pittsburgh, No. 05-CV-859, 2007 WL 320833, at *5 (W.D. Pa. Jan. 30, 2007). The court sees no reason, however, why complaints of off-duty domestic violence are necessarily insufficient to apprise a municipality of an obvious risk that the complained-of officer may have a tendency to engage in unwarranted violence. See Vann, 72 F.3d at 1051 (obvious risk of violence existed where police "officer had been identified by the police department as a 'violent-prone' individual who had a personality disorder manifested by frequent quick-tempered demands for 'respect,' escalating into physical confrontations for which he always disavowed responsibility"); cf. Parrish v. Luckie, 963 F.2d 201, 205-06 (8th Cir. 1992) (evidence that police chief was aware that officer had faced felony child abuse charges for whipping his child with an extension cord could be

17

Regardless of whether the City was aware of such a risk, however, Plaintiff's failure-to-supervise and failure-to-discipline theories are unavailing because he has not presented evidence from which a rational factfinder could conclude that the City acted with deliberate indifference to this risk. As noted above, "deliberate indifference may be inferred if [prior complaints of misconduct] are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents," Vann, 72 F.3d at 1049, or if the City's response is "so patently inadequate to the task as to amount to deliberate indifference," Reynolds v. Giuliani, 506 F.3d 183, 192-93 (2d Cir. 2007); see also Mahan v. City of New York, No. 00-CV-6645, 2005 WL 1677524, at *7 (E.D.N.Y. July 19, 2005) ("complete failure to investigate"). Plaintiff has not identified any complaints to which the City simply failed to respond. To the contrary, it appears to the court that the City investigated the complaints against Nelson and, to the extent those complaints were found to be substantiated, disciplined him, subjected him to increased force monitoring, and warned him that civilian complaints could derail his career. See Mahan, 2005 WL 1677524, at *5 (noting that the force monitoring program "is itself evidence of disciplinary action"). To the extent the complaints against Nelson were found to be unsubstantiated or were settled without an admission of liability by the City, those complaints do not provide a valid basis for concluding that the City was deliberately indifferent to his use of excessive force, because they do not, by themselves, establish that he used excessive force in the first place. See Tieman, 2015 WL 1379652, at *21; cf. Hart v. City of Binghamton, No. 10-CV-1064, 2012 WL 1565085, at *7 (N.D.N.Y. May 2, 2012) ("[T]he mere fact that the City has been sued does not mean that the prior suits were meritorious.").

---

used to show that the chief was aware of the officer's propensity for violence, in § 1983 suit based on officer's subsequent sexual assault of a detainee).

Plaintiff contends that the increased force monitoring to which Nelson was subjected after racking up numerous civilian complaints was "nothing more than a sham or a feigned attempt at discipline" because Nelson was unaware that he was subject to "Level II" force monitoring. (Pl. Opp'n at 9.) Nelson was aware, however, that he had been subject to "Level I" force monitoring because he had accumulated multiple CCRB complaints. (Nelson Dep. Tr. 27:5-24.) While it is true that Nelson did not recall being subject to "Level II" force monitoring (id. 28:11-29:24), this fact does little to help Plaintiff's case. Because the City subjected Nelson to "Level II" force monitoring after Plaintiff's arrest, Plaintiff cannot show that any deficiency with respect to this level of force monitoring actually caused him to suffer constitutional injury. Moreover, the fact that the City increased Nelson's force monitoring soon after Plaintiff's arrest shows that the City did supervise and discipline Plaintiff in response to complaints about his alleged use of excessive force, and tends to undermine any inference that the City acted with deliberately indifference to his violations of constitutional rights. (See NYPD Central Personnel Index Round Robin Report (Dkt. 47-8 at ECF p.2) at ECF p.4.)

Finally, Plaintiff argues, based on the fact that Nelson continued to receive civilian complaints while being monitored, that the NYPD's force-monitoring system is so ineffective as to constitute deliberate indifference to civilians' constitutional rights. (Pl. Opp'n at 9.) Complaints, without more, do not prove that a police officer actually violated anyone's constitutional rights, so those unsubstantiated complaints cannot support a rational conclusion that the NYPD's force-monitoring system was "so deficient as to reflect a policy of deliberate indifference to the civil rights of the citizenry." Mahan, 2005 WL 1677524, at *5 (quoting Sarus v Rotundo, 831 F.2d 397, 401-02 (2d Cir. 1987)).

*     *     *

Because Plaintiff has not produced evidence from which a rational factfinder could conclude that the City acted with deliberate indifference in failing to train, supervise, or discipline NYPD officers in general, or Hernandez and Nelson in particular, regarding the use of force against the public, the court GRANTS Defendants' motion for summary judgment as to Plaintiff's Monell claim.

### B. State Constitutional Claims

Defendants next argue that Plaintiff's claims under the New York State Constitution should be dismissed because New York courts recognize a private right of action for constitutional torts only in cases in which no alternative remedy is available. (Defs. Mem. at 6.) Because Plaintiff may maintain his equal-protection, search-and-seizure, and excessive-force claims under § 1983, Defendants argue, he may not also do so under the New York State Constitution. (Id.) The court accepts this argument in part and rejects it in part.

Like the U.S. Constitution, the New York State Constitution prohibits unreasonable searches and seizures, the use of excessive force against arrestees, and the denial of the equal protection of the laws. See N.Y. Const., art. I, §§ 11, 12; Bancroft v. City of Mount Vernon, 672 F. Supp. 2d 391, 404 (S.D.N.Y. 2009) (noting that excessive-force claims brought by arrestees are analyzed under Article One, § 12, of the New York State Constitution, which is New York's analogue to the Fourth Amendment to the U.S. Constitution). New York courts have recognized a private right of action to enforce these guarantees against the state under certain limited circumstances. Hewing closely to the reasoning of Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), which recognized a private right of action under the Fourth Amendment against federal officials, the New York Court of Appeals held in Brown v. State, 674 N.E.2d 1129 (N.Y. 1996), that the state constitution provides a private right

of action for money damages against the state for violations of the state Equal Protection and Search and Seizure Clauses. Brown, 674 N.E.2d at 1137-41.

The Court of Appeals subsequently narrowed Brown's "narrow remedy," holding that a private right of action for violations of the New York State Constitution exists only where such a right of action is necessary to address both "the private interest that citizens harmed by constitutional violations have an avenue of redress, and the public interest that future violations be deterred." Martinez v. City of Schenectady, 761 N.E.2d 560, 563 (N.Y. 2001). Accordingly, New York courts have held that a private right of action for violations of the state constitution is unavailable if an alternative remedy is available elsewhere, such as under state tort law or through a New York Civil Practice Law and Rules Article 78 action. See, e.g., Blake v. State, 42 N.Y.S.3d 875, 875-76 (App. Div. 2016); Shelton v. N.Y. State Liquor Auth., 878 N.Y.S.2d 212, 218 (App. Div. 2009); Ken Mar Dev., Inc. v. Dep't of Pub. Works, 862 N.Y.S.2d 202, 206 (App. Div. 2008); Waxter v. State, 826 N.Y.S.2d 754, 754-55 (App. Div. 2006); Bullard v. State, 763 N.Y.S.2d 371, 374 (App. Div. 2003).

Federal courts in this circuit have apparently uniformly held that no private right of action exists for violations of the New York State Constitution where the plaintiff has an alternative remedy under § 1983 for violations of parallel provisions of the U.S. Constitution. See, e.g., Allen v. Antal, 665 F. App'x 9, 13 (2d Cir. 2016) (summary order); Othman v. City of New York, No. 13-CV-4771 (NGG), 2018 WL 1701930, at *17 (E.D.N.Y. Mar. 31, 2018); Coleman v. Annucci, No. 17-CV-5031 (MKB), 2017 WL 6622544, at *4 n.9 (E.D.N.Y. Dec. 28, 2017); Sullivan v. Metro. Transit Auth. Police Dep't, No. 13-CV-7677 (NRB), 2017 WL 4326058, at *10 (S.D.N.Y. Sept. 13, 2017). These decisions rely on the premise that § 1983 provides an "adequate" alternative remedy for violations of the New York State Constitution. While that

premise may not be entirely sound,[6] Plaintiff concedes that § 1983 provides an adequate alternative remedy for his state-constitutional claims against Nelson and Hernandez (Pl. Opp'n at 14), so the court need not consider whether § 1983 <u>can</u> provide an adequate alternative remedy for violations of the New York State Constitution.

Instead, the court need only consider whether Plaintiff can maintain his state-constitutional claims against the City. Plaintiff contends that § 1983 does not supply an adequate alternative remedy for his state-constitutional claims against the City because he seeks to hold the City liable under a theory of respondeat superior, which is cognizable as a matter of state constitutional-tort law, but not under § 1983. <u>Compare</u> <u>Monell</u>, 436 U.S. at 691-95, <u>with</u> <u>Brown</u>, 674 N.E.2d at 1142. (Pl. Opp'n at 14-15.) Defendants appear to concede this general point. (Defs. Reply at 9.)

The court agrees with Plaintiff that § 1983 does not provide an adequate alternative remedy for Plaintiff's state-constitutional claims, to the extent they are asserted against the City under a theory of respondeat superior. Because § 1983 does not authorize respondeat-superior liability, <u>see</u> <u>Monell</u>, 436 U.S. at 691-95, it cannot provide an adequate alternative remedy for

---

[6] Section 1983 only provides a cause of action for deprivations "of rights, privilege, or immunities secured by the Constitution or laws <u>of the United States</u>." <u>Cornejo v. Bell</u>, 592 F.3d 121, 127 (2d Cir. 2010) (emphasis added) (quoting <u>Pitchell v. Callan</u>, 13 F.3d 545, 547 (2d Cir. 1994)). "It is axiomatic that violations of state law alone are insufficient to state a claim for [§] 1983 relief." <u>Powers v. Coe</u>, 728 F.2d 97, 105 (2d Cir. 1984). Because § 1983 cannot be used to vindicate the rights guaranteed to New Yorkers by their state constitution—only the parallel rights guaranteed by the U.S. Constitution—the notion that § 1983 provides an adequate alternative remedy for violations of state-constitutional rights is at least formally unsatisfying.

Moreover, state courts do not appear to have clearly endorsed the view that a plaintiff may not assert a claim under the New York State Constitution based on the same factual allegations that support a parallel § 1983 claim. <u>See, e.g.</u>, <u>Coleman</u>, 2017 WL 6622544, at *4 n.9 (stating that a <u>Brown</u> claim "cannot be maintained where . . . the factual allegations underlying any such claim are identical to the allegations of [p]laintiff's [§] 1983 claim, which provides adequate remedies for the alleged violations"). The Appellate Division, Third Department, seems to have accepted that the availability of a § 1983 remedy may obviate the need to imply a private right of action under state law for violations of parallel provisions of the New York State Constitution. <u>See</u> <u>Shelton</u>, 878 N.Y.S.2d at 218. At least one other state court has, however, rejected as contrary to <u>Brown</u> the notion that no private right of action under the New York State Constitution is available simply because § 1983 furnishes <u>some</u> remedy for violations of parallel provisions of the federal Constitution. <u>See</u> <u>Boggs v. State of New York</u>, 25 N.Y.S.3d 545 (Ct. Cl. 2015) (disagreeing with, <u>inter alia</u>, <u>Wahad v. FBI</u>, 994 F. Supp. 237, 240 (S.D.N.Y. 1998)).

Plaintiff's New York State constitutional claims, to the extent they are asserted against the City. As the Court of Appeals recognized in Brown, "[a] plaintiff seeking to recover on the basis of respondeat superior simply does not come within the terms of [§] 1983." 674 N.E.2d at 1142. Indeed, the weight of case law in this circuit supports the conclusion that § 1983 is not an adequate alternative remedy for state-constitutional claims that rely on a theory of respondeat superior. See Brown v. City of New York, No. 13-CV-6912, 2017 WL 1390678, at *15 (S.D.N.Y. Apr. 17, 2017); Espinoza v. City of New York, 194 F. Supp. 3d 203, 208 (E.D.N.Y. 2016); Campbell v. City of New York, No. 09-CV-3306 (FB), 2011 WL 6329456, at *5 (E.D.N.Y. Dec. 15, 2011); Vilkhu v. City of New York, No. 06-CV-2095 (CPS), 2008 WL 1991099, at *9 (E.D.N.Y. May 5, 2008). To the extent other courts in this district have held that § 1983 furnishes an adequate alternative remedy to state constitutional claims premised on a theory of respondeat superior, notwithstanding that § 1983 does not recognize respondeat superior liability, the court respectfully finds these cases unpersuasive and declines to follow them for the reasons discussed above. See Felmine v. City of New York, No. 09-CV-3768 (CBA), 2012 WL 1999863, at *7 (E.D.N.Y. June 4, 2012); Wahad v. FBI, 994 F. Supp. 237, 240 n.4 (S.D.N.Y. 1998).[7]

That does not mean, however, that all of Plaintiff's claims against the City under the New York State Constitution can proceed to trial. Defendants argue that Plaintiff's allegations of

---

[7] In particular, the court in Wahad reasoned that requiring only some remedy, rather than an equivalent remedy, to displace the implied private right of action under the New York State Constitution was consistent with post-Bivens case law, in which the Supreme Court had "refused to imply constitutional damages where Congress has created an alternative remedy, even where the alternative remedy offers significantly less protection to plaintiff." 994 F. Supp. at 240 n.4 (citing Bush v. Lucas, 462 U.S. 367, 388-90 (1983)). In Brown, however, the Court of Appeals based its decision in significant part on Bivens despite expressly acknowledging that the Supreme Court had subsequently narrowed Bivens's scope. 674 N.E.2d at 1138. This court does not see why the Supreme Court's "general reluctance to extend judicially created private rights of action," Jesner v. Arab Bank, PLC, — S. Ct. —, 2018 WL 1914663, at *15 (2018), implies that the New York Court of Appeals would be similarly reluctant to recognize private rights of action under state law, see generally Uhr ex rel. Uhr v. E. Greenbush Cent. Sch. Dist., 720 N.E.2d 886, 888 (N.Y. 1999) (stating New York's test for implying a private right of action in a state statute).

excessive force in violation of Article I, § 12, of the New York State Constitution are essentially duplicative of his assault and battery claims. (Defs. Reply at 9.) Under New York law, a state constitutional-tort claim will not lie when state tort law provides an alternative means of redress. E.g., Waxter v. State, 826 N.Y.S.2d 754, 754-55 (App. Div. 2006); Lyles v. State, 770 N.Y.S.2d 81, 82 (App. Div. 2003). Plaintiff's claim of excessive force under the state constitution effectively duplicates his assault and battery claims, as state-law excessive force claims are analyzed using substantially the same standard that applies to assault and battery claims. See Posr v. Doherty, 944 F.2d 91, 94-95 (2d Cir. 1991) (stating that the requirements of an excessive-force claim under the Fourth Amendment to the U.S. Constitution were "substantially identical" to the requirements for an assault-and-battery claim under New York law, except that the former requires state action); People v. Johnson, 488 N.E.2d 439, 449 (N.Y. 1985) (noting that courts generally read Article I, § 12, of the New York State Constitution in line with the Fourth Amendment). Defendants have not challenged the legal sufficiency of Plaintiff's assault and battery claims, nor have they argued that the City cannot be vicariously liable for such claims. Accordingly, the court concludes that Plaintiff has an adequate alternative remedy under state tort law for his state-constitutional excessive-force claim, and that this claim therefore is unavailing.

Defendants offer no persuasive explanation, however, as to why state law provides Plaintiff adequate alternative remedies for his state-constitutional equal-protection and search-and-seizure claims. Defendants seem to argue that these claims are duplicative of his assault and battery claims. (Defs. Reply at 9.) But the intentional torts of assault and battery do not share the elements of the state constitutional claims in dispute, which protect wholly different legal interests—namely, the right not to be unreasonably detained and searched, and the right not to be

subject to racially discriminatory government action, as opposed to the right not to be physically threatened and injured. While Defendants assert that plaintiff could have brought his equal-protection or search-and-seizure claims "under state law, but he chose not to," this assertion is hard to understand, as Plaintiff asserted these claims under the New York State Constitution, which is, of course, "state law." More importantly, Defendants fail to identify any specific state causes of action that would render Plaintiff's state equal-protection and search-and-seizure claims unnecessary. Defendants have not shown that Plaintiff has an adequate alternative remedy for these claims, to the extent these claims are asserted against the City.

Accordingly, the court GRANTS Defendants' motion for summary judgment with respect to all claims asserted under the New York State Constitution against Nelson and Hernandez; GRANTS the motion with respect to Plaintiff's state-constitutional excessive-force claim, to the extent it is asserted against the City; and DENIES the motion with respect to Plaintiff's state-constitutional equal-protection and search-and-seizure claims, to the extent they are asserted against the City.

### C. Claims Against the NYPD

Finally, Defendants briefly argue that any claims against the NYPD should be dismissed because the NYPD is not a suable entity. (Defs. Mem. at 3 n.1.) Defendants' argument is correct. See Jenkins, 478 F.3d at 93 n.19. Accordingly, all claims against the NYPD are DISMISSED with prejudice.

## IV.    CONCLUSION

Defendants' motion for partial summary judgment (Dkt. 42) is GRANTED IN PART and

DENIED IN PART.  The court dismisses the following claims with prejudice:

- Plaintiff's fourth (Monell) cause of action;

- Plaintiff's fifth cause of action (New York State equal protection), to the extent
  this claim is asserted against Nelson and Hernandez;

- Plaintiff's sixth cause of action (New York State search and seizure and excessive
  force), to the extent he alleges that Nelson and Hernandez subjected him to an
  unreasonable search and seizure or that any Defendant used, or is vicariously
  liable for the use of, excessive force against him;

- Plaintiff's seventh cause of action (IIED);

- Plaintiff's tenth cause of action (negligence); and

- Plaintiff's eleventh cause of action (negligent hiring and retention).

Furthermore, the court dismisses all claims against the NYPD with prejudice.

The court denies Defendants' motion for summary judgment with respect to Plaintiff's

New York State equal-protection and search-and-seizure claims, to the extent he asserts these

claims against the City under a theory of respondeat superior.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      May _1_, 2018

NICHOLAS G. GARAUFIS
United States District Judge